**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **NICHOLAS DIFLORIO** | : | **CIVIL ACTION** |
| | : | |
| **v.** | : | |
| | : | **NO.  11-4405** |
| **SCOTT KLECKNER, et al.** | : | |

<u>**MEMORANDUM OPINION**</u>

Savage, J.                                                                                                    **March 6, 2012**

        Plaintiff Nicholas DiFlorio alleges that he was twice fired by defendant Aramark

Sports, LLC ("Aramark") in violation of the Age Discrimination in Employment Act of 1967,

29 U.S.C. §§ 621-634 ("ADEA"), once because of his age, and again, after he had been

rehired, because he had threatened to file an EEOC charge for age discrimination.

Aramark asserts that he was terminated for violating company policy and displaying a

flippant attitude when confronted about the violation.  After he was reinstated, Aramark

claims that DiFlorio's employment ended not because he was fired, but because he

stopped reporting for work.

        Moving for summary judgment, Aramark argues that on his age discrimination claim,

DiFlorio cannot establish a discriminatory pretext to rebut its legitimate, non-discriminatory

reason of firing him for violating company policy.[1]  Aramark argues that the retaliation claim

fails because DiFlorio, having quit, did not suffer an adverse employment action.  Aramark

also claims that he cannot demonstrate causation or establish pretext.  Alternatively,

Aramark claims that DiFlorio has failed to mitigate his damages.

        Contesting the motion for summary judgment, DiFlorio argues that he did not violate

---

        [1] DiFlorio also claimed that two supervisor-defendants violated the Pennsylvania Human Relations
Act, 43 Pa.C.S.A. § 951, et seq. ("PHRA").  We granted Aramark's unopposed motion to dismiss the PHRA
claim as time-barred and, accordingly, dismissed the claim as to the supervisor-defendants.

company policy, rebutting Aramark's reason for his first termination.  As to his retaliation

claim, he maintains that he did not quit, but was fired or constructively discharged soon

after he notified his Aramark supervisors that he was going to file an Equal Employment

Opportunity Commission (EEOC) age discrimination charge.  He maintains that he

mitigated his damages.

After considering the record presented to us, we shall grant Aramark's motion to

dismiss the age discrimination claim and deny the motion as to the retaliation claim.

DiFlorio has offered insufficient evidence, direct or indirect, from which a jury could

conclude that Aramark's reason for terminating him from the Wachovia Center was a

pretext for age discrimination.  With respect to the retaliation claim, there is a genuine

issue of material fact regarding whether DiFlorio quit or was fired.  Thus, it is for the jury

to determine if he suffered an adverse employment action.  Disputed issues of material fact

preclude us from determining, at this time, that DiFlorio failed to mitigate his damages by

withdrawing from the employment market.

## Background

On February 3, 2009, while working as the Lead Concessions Supervisor at the

Wachovia Center, DiFlorio "comp'ed"[2] sandwiches and beverages to three acquaintances.

Aramark contends DiFlorio violated company policies and procedures because he did not

have permission from a supervisor to comp the items, did not use a comp coupon, and

failed to properly document the comp.  DiFlorio argues that he followed Aramark's comp

policy.  He claims that one of his supervisors, Bob Barr, gave him the authority to comp

---

[2] The parties use the term "comp," an abbreviation of "complimentary," to refer to providing something free of charge.

food and drinks on nightly events so long as he properly recorded the comps.  However, he concedes that he did not properly record the comps.

The following day, DiFlorio met with two of his supervisors, Barr and Scott Kleckner, and a Human Resources Manager, Kelli Joseph, to discuss the incident.  DiFlorio admitted to comp'ing the sandwiches and drinks, but claimed he had the authority to do so on nightly events.  Kleckner then suspended DiFlorio pending further investigation of the incident.

On February 7, 2009, after reviewing DiFlorio's personnel file and speaking with Elin Salinger, the Senior Human Resources Manager, Kleckner, Barr, and Joseph met with DiFlorio and terminated his employment.  They had decided to fire DiFlorio because "he understood the policy, chose not to follow it, and didn't comprehend what a major issue and a big deal it was" and "he displayed a flippant attitude showing that he didn't understand the gravity of the offense nor did he feel he had done anything wrong[,] which . . . was alarming."[3]

At DiFlorio's request, Salinger and Aramark District Manager Brian Hastings met with him on February 20, 2009 to discuss the comp'ing incident.  After considering DiFlorio's retelling of the incident and reviewing his employment record, Salinger and Hastings offered DiFlorio a position as a Concessions Supervisor at the Susquehanna Bank Center ("SBC") and Lincoln Financial Field.  DiFlorio accepted the offer after some deliberation.

DiFlorio missed his first day of work at SBC on May 26, 2009 because he sprained his ankle.  He missed five subsequent events.

---

[3] Def.'s Statement of Facts ("SOF") ¶ 26 (quoting Kleckner Dep. 37-38, 46, 53-54).

On July 6, 2009, DiFlorio sent an email to Salinger; Hastings; Barr; Keith Gibbons, his supervisor at SBC; and Beth Genther, the Aramark Human Resources Manager for SBC at the time, stating that he had "decided to file an age discrimination law suit [sic] with the EEOC against Aramark over [his] dismissal from the Wachovia [C]enter."[4]  Aramark claims that the following day, DiFlorio's rate of pay was increased retroactively from $11.50/hour to $15.25/hour, the same rate he had been paid while working at the Wachovia Center.  DiFlorio claims he was offered the same rate of pay at the time he was reinstated.  The parties agree that he continued to work for Aramark after sending the email, including an event five days later on July 11, 2009.

Beginning July 17, 2009, DiFlorio was unable to work at several SBC events because of foot and ankle problems.  DiFlorio consistently emailed Gibbons before an event to notify him that he was unable to work.  Despite these timely notifications, Aramark managers discussed the absences, stating in emails that they planned to terminate DiFlorio.  However, no one contacted DiFlorio telling him he was terminated.

By August 11, 2009, DiFlorio had missed half of the events for the SBC season.[5] At Gibbons's request, DiFlorio faxed Salinger a doctor's note, which verified that he was not to work and was to stay off his feet from July 19, 2009 to August 18, 2009.[6]

Salinger called DiFlorio on August 20, 2009.  Although the parties dispute the substance of the conversation, they agree that Salinger did not tell DiFlorio that she was

---

[4] Def.'s Ex. 11.  DiFlorio filed complaints with the EEOC and Pennsylvania Human Relations Commission against Kleckner in late October, 2009, alleging age discrimination, and against Gibbons in mid-April, 2010, alleging retaliation.  Pl.'s First Am. Compl. ¶¶ 22-23.

[5] Def.'s SOF ¶ 61.

[6] Def.'s SOF ¶ 63.

terminating his employment.  DiFlorio alleges she told him that "things aren't working out," so "why don't you just resign."[7]  DiFlorio did not work any of the five remaining events at SBC.[8]

According to Aramark, DiFlorio's employment ended "[a]s a result of [his] failure to return to work or contact anyone at Aramark."[9]  Aramark claims that after his conversation with Salinger on August 20, 2009, DiFlorio did not contact anyone from Aramark to discuss returning to work.  Gibbons denied that he spoke with DiFlorio at any time after August 20, 2009.

Contradicting Gibbons, DiFlorio testified that he called Gibbons on four occasions in August and September of 2009 to tell him he was cleared by his doctor to return to work.[10]  DiFlorio avers that he spoke with Gibbons who told him that DiFlorio's schedule was out of his hands.  DiFlorio alleges that despite his efforts, he was never contacted or scheduled to work.   Hence, DiFlorio contends that he was fired or constructively discharged.

### Aramark's Motion for Summary Judgment and DiFlorio's Response

#### *Age Discrimination*

According to Aramark, DiFlorio's age discrimination claim fails at step three of the *McDonnell Douglas* test because he cannot demonstrate that its reason for firing him from the Wachovia Center was a pretext for age discrimination.   Aramark contends that it

---

[7] DiFlorio Dep. 124.

[8] Def.'s SOF ¶ 67.

[9] Def.'s SOF ¶ 71.

[10] Pl.'s Resp. to Def.'s Mot. Summ. J. ¶ 44 (quoting DiFlorio Dep. 137-42).

terminated DiFlorio because he violated its "comp" policies and procedures.  Aramark's Employee Handbook for Wachovia Center states that "the unauthorized sale or giveaway of any product or merchandise at any time by any employee" and "giving away free food without manager or supervisor approval" are grounds for termination.[11]  According to Aramark, he did not ask for permission from a supervisor and did not properly document the comps.  Even if he had permission, he did not record the transactions as required by company policy.[12]  When confronted about the violation, Aramark contends that DiFlorio was flippant and did not take the violation seriously.

Aramark also argues that DiFlorio has no evidence of age animus.  It points out that although Kleckner appeared to take the lead in the decision to fire him, DiFlorio has no evidence that he knew his age or that his decision was motivated by age discrimination.

DiFlorio contends that there is a genuine issue of material fact as to whether he violated the Wachovia Center comp policy.  He claims that, consistent with Aramark's practice at the Wachovia Center, he was given the authority to comp food and drinks during nightly events if the comps were properly documented.  To rebut Aramark's reliance on the Employee Handbook for Wachovia Center, DiFlorio notes that Kleckner testified that the policy for comps for friends and family is a "known policy that evolves over time."[13]

DiFlorio relies on three comments made by two supervisors to demonstrate age animus.  During a meeting with Salinger and Hastings following his termination, he claims

---

[11] Def.'s SOF ¶ 12 (quoting Def.'s Ex. 2, at 33).

[12] Def.'s Ex. 2, at 33 ("Failure to satisfactorily account for property or inventory stock," including food, is grounds for immediate termination.).

[13] Kleckner Dep. 66-67.

that Hastings told him they "were looking to change the culture" at the Wachovia Center, so they could not reinstate him there.[14]  In an email chain between Hastings and Gibbons, Gibbons wrote that "if there are any other people that should no longer be working, just let me know . . ." and Hastings replied that DiFlorio "is not a bad guy.  He was just at Wachovia to [sic] long."[15]

DiFlorio claims that nine other Aramark concession employees over the age of forty were terminated from 2007 to the present.  He maintains that this evidence, taken together, creates a genuine issue of material fact as to whether he was fired because of his age.

*Retaliation*

Aramark challenges DiFlorio's retaliation claim on two grounds.  First, it argues that DiFlorio did not suffer an adverse employment action during his tenure at SBC.  Although he missed several SBC events, Aramark never disciplined him or terminated his employment.  Despite emails indicating that Aramark was considering whether to terminate his employment due to poor attendance, the decision was never finalized and no one from Aramark told DiFlorio that he was fired.  Instead, Aramark contends DiFlorio voluntarily quit when he stopped coming to work and did not contact anyone at Aramark.[16]

Second, Aramark contends DiFlorio cannot establish pretext.  It claims that DiFlorio has no evidence to rebut its asserted legitimate reason that he quit and was not fired.  Moreover, there is no evidence of Gibbons acting in retaliation.  Instead, he overlooked

---

[14] DiFlorio Dep. 44.

[15] Pl.'s Ex. 16, at 1.  DiFlorio also claims that Aramark stated it wanted to bring in a younger workforce and that DiFlorio was too old to continue working at Wachovia Center.  The evidence DiFlorio cites does not support these assertions.

[16] Accordingly, Aramark also argues that DiFlorio cannot demonstrate causation.

DiFlorio's absences even though he was not entitled to medical leave.

DiFlorio counters that he has stated a *prima facie* case for retaliation. He claims he suffered an adverse employment action because he was fired or constructively terminated. Salinger allegedly told him on August 20, 2009 that "things aren't working out," so "[w]hy don't you just resign;" and despite his purported attempts to return to work, Gibbons would not schedule him for events at SBC. DiFlorio argues that this behavior and an email chain between his supervisor and representatives from Human Resources indicate that Aramark planned to end his employment and did so by not scheduling him for events.

DiFlorio argues that he can demonstrate the causation nexus by the temporal proximity of his protected activity – notifying Aramark that he was filing an age discrimination charge with the EEOC – and his termination. DiFlorio sent the email on July 6, 2009. He claims that he was discharged "in or about August 2009," presumably after his call with Salinger on August 20, 2009. This one to two month period, according to DiFlorio, supports an inference that retaliation motivated Aramark to terminate his employment.

Aramark argues that the non-retaliatory reason why DiFlorio is no longer employed at SBC is because he "stopped coming to work and ultimately stopped contacting Aramark after August 20, 2009."[17] Before DiFlorio abandoned his job, Gibbons continued to overlook DiFlorio's failure to attend events despite the fact that he was not entitled to any medical leave, and Gibbons testified that he had no problem with DiFlorio coming back to work, belying any inference of retaliation.

---

[17] Def.'s Mem. in Supp. of Mot. Summ. J. 13.

DiFlorio does not attempt to directly rebut Aramark's reason for ending his employment.  However, in arguing that he did in fact suffer an adverse employment action, he maintains that Aramark's reason for terminating him from SBC is not credible.  He contends that he consistently notified Gibbons when he was unable to work an event due to his injury.  Nonetheless, Aramark argues that after he recovered and was able to return to work, he stopped contacting them.

**Standard of Review**

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and that the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  Judgment will be entered against a party who fails to sufficiently establish any element essential to that party's case and who bears the ultimate burden of proof at trial.  *See Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).  In examining the motion, we must draw all reasonable inferences in the nonmovant's favor.  *InterVest, Inc. v. Bloomberg, L.P.*, 340 F.3d 144, 159-60 (3d Cir.2003).

The initial burden of demonstrating there are no genuine issues of material fact falls on the moving party.  Fed. R. Civ.P. 56(a).  Once the moving party has met its burden, the nonmoving party must counter with "'specific facts showing that there is a genuine issue for trial.'"  *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (citation omitted).  The nonmovant must show more than the "mere existence of a scintilla of evidence" for elements on which she bears the burden of production.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986).  Bare assertions, conclusory allegations or suspicions are not sufficient to defeat summary judgment.  *Fireman's Ins. Co. v. DuFresne*, 676 F.2d 965, 969 (3d Cir.1982).  Thus, "[w]here the record taken as a whole could not

lead a rational trier of fact to find for the non-moving party, there is no 'genuine issue for trial.'"  *Matsushita*, 475 U.S. at 587 (citation omitted).

### Age Discrimination

The ADEA prohibits discrimination in hiring, discharge, "compensation, terms, conditions, or privileges of employment" on the basis of age.  29 U.S.C. § 623(a)(1) (2006). DiFlorio argues that Aramark's justifications for firing him are pretext for age discrimination. Therefore, we apply the *McDonnell Douglas* burden-shifting framework familiar to Title VII race and sex discrimination claims.  *See Fasold v. Justice*, 409 F.3d 178, 184 (3d Cir. 2005) (citing *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973)); *see also Smith v. City of Allentown*, 589 F.3d 684, 691 (3d Cir. 2009) (holding that the *McDonnell Douglas* framework still applies to ADEA claims after the Supreme Court's decision in *Gross v. FBL Fin. Servs.*, 557 U.S. 167 (2009)).

If DiFlorio makes out a *prima facie* case, the burden of production shifts to Aramark "to identify a legitimate non-discriminatory reason for the adverse employment action." *Smith*, 589 F.3d at 690 (citing *Keller v. Orix Credit Alliance, Inc.*, 130 F.3d 1101, 1108 (3d Cir. 1997)).  If Aramark satisfies that burden, DiFlorio then must demonstrate that the employer's proffered rationale was a pretext for age discrimination.  *Id.* (citing *Starceski v. Westinghouse Elec. Corp.*, 54 F.3d 1089, 1095 n.4 (3d Cir. 1995)).  This final burden of production "merges with the ultimate burden of persuading [the jury] that [he] has been the victim of intentional discrimination."  *Tex. Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 256 (1981).  The ultimate burden of persuasion, including the burden to show that discriminatory intent was a "but-for" cause of Aramark's adverse employment action, rests

with DiFlorio at all stages of the proceeding.  *Smith*, 589 F.3d at 690-91 (citing *Gross*, 557 U.S. at __, 129 S.Ct. at 2350–51).

To make out a *prima facie* case of age discrimination, DiFlorio must show that: (1) he is 40 years of age or older; (2) Aramark took an adverse employment action against him; (3) he was qualified for the position from which he was removed; and (4) he "was ultimately replaced by another employee who was sufficiently younger to support an inference of discriminatory animus." *Smith*, 589 F.3d at 689-90 (citing *Potence v. Hazleton Area Sch. Dist.*, 357 F.3d 366, 370 (3d Cir. 2004)).

DiFlorio has made out a *prima facie* case on his age discrimination claim.  He was over the age of forty when he was fired; he held the position of and was thus qualified as a Lead Concession Supervisor; he was terminated on February 7, 2009; and he was replaced by someone "significantly younger."  *See Sempier v. Johnson & Higgins*, 45 F.3d 724, 729 (3d Cir. 1995) (holding that the plaintiff need not show any specific age difference to satisfy the fourth element of the *prima facie* case, and that even a five-year difference can be sufficient) (citations omitted).

Aramark argues that DiFlorio cannot establish pretext to rebut its two reasons for firing him from the Wachovia Center.  First, it alleges that DiFlorio violated the company's comp policy when he failed to get permission to comp the food and beverages and to properly record the comps.  Second, during the meeting to discuss the incident, DiFlorio had a flippant attitude and did not take the violation seriously.

DiFlorio's age discrimination claim fails at the third *McDonnell Douglas* step.  To meet his burden of persuasion to show that age bias was a "but-for" cause of Aramark's action against him, *Smith*, 589 F.3d at 690-91, DiFlorio must present evidence from which

a jury could either disbelieve the employer's articulated reasons or believe that an invidious discriminatory reason was more likely than not the determinative cause of the employer's actions. *Fuentes v. Perskie*, 32 F.3d 759, 764 (3d Cir. 1994).

DiFlorio maintains that Aramark's reason for firing him is not credible because he had permission to comp food and beverages so long as he properly documented the transactions. There is no dispute that comps are allowed as long as the employee has permission. The dispute is whether DiFlorio had permission. He maintains that his supervisor, Barr, had given him authority to comp food and beverages at nightly events. Barr and another supervisor, Kleckner, contradicted him, testifying that he had no such authority. Nonetheless, despite this factual dispute, DiFlorio agrees that the comps were not properly recorded, in violation of company policy.

The Consumption/Spoilage Report confirms that DiFlorio did not correctly account for the comp'ed items. The top of the form reads "Employee Consumption," with "Spoilage/Coupon/Complimentary" on the bottom. The Report shows three sandwiches for DiFlorio under "Employee Consumption," not "Spoilage/Coupon/Complimentary."[18] Although the report was completed by another Aramark employee, DiFlorio signed the form. He concedes that the form "was filled out incorrectly."[19]

Considering that he violated company policy, DiFlorio has failed to demonstrate "weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions" in Aramark's reasons for terminating him. *Fuentes*, 32 F.3d at 765 (citation omitted). Nor

---

[18] Def.'s Ex. 1.

[19] DiFlorio Dep. 55-56.

can he show that age bias was a determinative cause in Aramark's decision to terminate his employment.

DiFlorio claims that Aramark fired nine other concession employees over the age of forty from 2007 to the present. This bare allegation alone is insufficient to support an inference of a discriminatory motive because DiFlorio has not identified any evidence to suggest that these dismissals were motivated by unlawful discrimination. He has provided no contextual, statistical, or circumstantial evidence relating to these other terminations. *See, e.g.*, *Troupe v. May Dep't Stores Co.*, 20 F.3d 734, 736 (7th Cir. 1994). Nor does he offer any circumstantial evidence, such as derogatory comments by supervisors, to show that the alleged actions against the other concession employees were because of age bias. *See, e.g.*, *Hasan v. Foley & Lardner LLP*, 552 F.3d 520, 527-28 (7th Cir. 2008) (citing *Troupe*, 20 F.3d at 737). Moreover, Salinger testified that Kleckner also fired employees under the age of forty from the Wachovia Center.[20] DiFlorio's allegation does not create an inference of age discrimination sufficient to overcome summary judgment. *See Homel v. Centennial Sch. Dist.*, __ F. Supp. 2d __, 2011 WL 6412227, at *8 n.19 (E.D. Pa. Dec. 21, 2011).

DiFlorio argues that comments made by Hastings and Gibbons demonstrate their age-based bias. He cites Hastings explaining that he could not assign DiFlorio to the Wachovia Center upon his reinstatement because Aramark was "looking to change the culture" at the facility.[21] He also points to an email conversation where Gibbons wrote that

---

[20] Salinger Dep. 92-93.

[21] DiFlorio Dep. 44.

"if there are any other people that should no longer be working, just let me know," and Hastings replied: "Nick [DiFlorio] is not a bad guy or supervisor.  He was just at Wachovia to [sic] long."[22]

These comments do not support an inference of discrimination.  They are ambiguous and do not refer to age.  *See Nat'l Amusements, Inc. v. Town of Dedham*, 43 F.3d 731, 743-44 (1st Cir. 1995) ("While ambiguous remarks may, under some circumstances, help to illuminate the summary judgment record, such remarks rarely will suffice to conceive an issue of material fact when none otherwise exists."); *Zivkovic v. Juniper Networks, Inc.*, 450 F. Supp. 2d 815, 824 (N.D. Ohio 2006) ("Isolated and ambiguous comments 'are too abstract . . . to support a finding of age discrimination'") (quoting *Phelps v. Yale Sec., Inc.*, 986 F.2d 1020, 1025 (6th Cir. 1993)).  For instance, in response to Gibbons's comment about "other people that should no longer be working," Hastings stated that DiFlorio "is not a bad guy or supervisor," but had been at Wachovia too long, speaking to his tenure at one location, not his age.

Even assuming the comments could be construed to relate to DiFlorio's age, there is no evidence that Hastings or Gibbons played any role in the decision to terminate him from the Wachovia Center.  "Stray remarks by non-decisionmakers or by decisionmakers unrelated to the decision process are rarely given great weight, particularly if they were made temporally remote from the date of decision."  *Ezold v. Wolf, Block, Schorr, & Solis-Cohen*, 983 F.2d 509, 545 (3d Cir. 1993).  Moreover, Hastings and Gibbons were speaking about DiFlorio's reinstatement as an Aramark employee and his assignment to SBC, not

---

[22] Pl.'s Ex. 16, at 1.

his termination.

DiFlorio has proffered no evidence from which a factfinder could reasonably believe that age discrimination was more likely than not the determinative cause of Aramark's actions. *Fuentes*, 32 F.3d at 764. Therefore, Aramark is entitled to summary judgment on DiFlorio's age discrimination claim.

## Retaliation

As with his age discrimination claim, DiFlorio may prove unlawful retaliation using either a direct or indirect method of proof. *See Walden v. Georgia-Pacific Corp.*, 126 F.3d 506, 512-13 (3d Cir. 1997). Again, DiFlorio proceeds under the indirect method.

To make out a *prima facie* case of ADEA retaliation under the indirect method using the *McDonnell Douglas* framework, DiFlorio must show that: (1) he engaged in protected activity; (2) Aramark took an adverse employment action against him; and (3) there was a causal connection between DiFlorio's activity and Aramark's action. *See Fasold*, 409 F.3d at 188 (citing *Fogleman v. Mercy Hosp., Inc.*, 283 F.3d 561, 567-68 (3d Cir. 2002)). If DiFlorio does so, the burden shifts to Aramark to advance a legitimate, non-retaliatory reason for its actions. *Moore v. City of Philadelphia*, 461 F.3d 331, 342 (3d Cir. 2006). If Aramark succeeds, the burden is on DiFlorio to persuade the jury that Aramark's articulated reasons are pretext for its unlawful retaliation. *Id.*

DiFlorio has satisfied the first element. His email notifying Aramark that he intended to file an EEOC charge is protected activity. Whether DiFlorio suffered an adverse employment action is not so clear. Nonetheless, at this stage, his testimony detailing his efforts to return to work satisfies the second element that he suffered an adverse employment action.

15

An "adverse employment action" is a "significant change in employment status, such as hiring, firing, failing to promote, reassignment, or a decision causing a significant change in benefits." *Weston v. Pennsylvania*, 251 F.3d 420, 431 (3d Cir. 2001) (quoting *Burlington Indus. Inc. v. Ellerth*, 524 U.S. 742, 749 (1998)). "Minor changes in duties or working conditions, even unpalatable or unwelcome ones, which cause no materially significant disadvantage, do not rise to the level of an adverse employment action." *Clegg v. Ark. Dep't of Corr.*, 496 F.3d 922, 926 (8th Cir. 2007) (quoting *Higgins v. Gonzales*, 481 F.3d 578, 584 (8th Cir. 2007) (internal quotations omitted)). DiFlorio carries the burden of demonstrating that Aramark's alleged actions against him amounted to an adverse employment action to form the basis of his retaliation cause of action. *See Colon–Fontanez v. Municipality of San Juan*, 660 F.3d 17, 42 (1st Cir. 2011).

The August 20th call from Salinger does not substantiate that an adverse employment action was taken. According to DiFlorio, Salinger told him that "things aren't working out" so "[w]hy don't you just resign." This comment, without more, is insufficient to demonstrate an adverse employment action. *See Ilori v. Carnegie Mellon Univ.*, 742 F. Supp. 2d 734, 760 (3d Cir. 2010) (holding statement by supervisor that if plaintiff did not resign he would pick a date for him to resign and that plaintiff's days were numbered did not rise to the level of an adverse employment action because the threat was never carried out). If, as Aramark claims, DiFlorio made no effort to return to work after this call, essentially abandoning his job, he has not suffered an adverse employment action. *See Roby* v. *CWI, Inc.*, 579 F.3d 779, 783-84 (7th Cir. 2009) (holding plaintiff failed to demonstrate she suffered an adverse employment action where she was never told that she was terminated and employer removed her from work schedule after she made no

effort to call or return to work).

DiFlorio claims that he was terminated[23] because he was not scheduled to work after he called Gibbons four times and spoke with him at least once.[24]   During that conversation, DiFlorio purportedly told Gibbons that his foot and ankle had recovered and that he was ready to return to work.  DiFlorio claims that Gibbons told him his schedule was out of his hands.[25]

Gibbons denies that he spoke with DiFlorio after August 20, 2009.[26]  DiFlorio initially relied on his cell phone records to support his claim that he called Gibbons.   Gibbons testified that the phone number DiFlorio claims he called is not his.  Aramark argues that in the absence of documentary evidence, DiFlorio's self-serving testimony is insufficient to create a genuine dispute of material fact.  We disagree.

DiFlorio's testimony that he called Gibbons four times in August and September of 2009 and spoke with him once constitutes evidence.  The Federal Rules of Civil Procedure permit a nonmoving party to defeat summary judgment through the use of an affidavit or declaration.  *See* Fed. R. Civ. P. 56(c)(1)(A) (a plaintiff may assert that a fact is genuinely disputed by "citing to particular parts of materials on the record, including depositions . . . . affidavits or declarations"); Rule 56(c)(4) (requiring affidavits or declarations "be made on

---

[23] DiFlorio also uses the term "constructive discharge" to describe Aramark's alleged adverse employment action.  DiFlorio has offered no evidence that "a reasonable jury could find that the [employer] permitted conditions so unpleasant or difficult that a reasonable person would have felt compelled to resign." *Colwell v. Rite Aid Corp.*, 602 F.3d 495, 502 (3d Cir. 2010) (quoting *Duffy v. Paper Magic Group, Inc.*, 265 F.3d 163, 167 (3d Cir. 2001)).

[24] DiFlorio Dep. 137-42.

[25] DiFlorio Dep. 141.

[26] Gibbons Dep. 92.

personal knowledge, set out facts that would be admissible in evidence, and show that the affiant or declarant is competent to testify on the matters stated.").[27]  As Rule 56(c)(1)(A) indicates, deposition testimony qualifies.  In fact, it is preferable because it gives the opposing party the opportunity to cross-examine the witness.  *See In re CitX Corp.*, 448 F.3d 672, 680 (3d Cir. 2006) (observing that "depositions are one of the best forms of evidence for supporting or opposing a summary judgment motion, and that affidavits, not being subject to cross-examination, are likely to be scrutinized carefully by the court to evaluate their probative value" (quotations omitted)).

To create a genuine issue of fact, DiFlorio's testimony must "set forth facts, rather than opinions or conclusions."  *Maldonado v. Ramirez*, 757 F.2d 48, 51 (3d Cir. 1985); *see also Kirleis v. Dickie, McCamey & Chilcote, P.C.*, 560 F.3d 156, 161 (3d Cir. 2009) ("[C]onclusory, self-serving affidavits are insufficient to withstand a motion for summary judgment.") (quoting *Blair v. Scott Speciality Gases*, 283 F.3d 595, 608 (3d Cir. 2002)).  In *Kirleis*, the court rejected the defendant's challenge to plaintiff's reliance on her own affidavit to avoid summary judgment.  560 F.3d at 161-62.  Because the plaintiff set forth specific details in her affidavit, the facts she averred created a genuine issue for trial.  *Id.* at 162.

DiFlorio does not rely on a conclusory statement that he contacted an unnamed Aramark employee at some unspecified date to inquire about scheduling.  Instead, he is specific.  He states that he called Gibbons on four occasions in August and September. He claims that on the one occasion he spoke to Gibbons, he told him that the schedule

---

[27] Aramark does not argue that DiFlorio's testimony fails under Rule 56(c)(4).  DiFlorio's testimony, based in part on his memory of making the phone calls, meets the requirements of 56(c)(4).

was out of his hands.

Aramark also argues that because Gibbons rebutted his testimony, DiFlorio has not created a genuine dispute.  On the contrary, the fact that Gibbons testified DiFlorio did not call him does not negate DiFlorio's testimony.  Instead, it raises a question of credibility.  *See Kirleis*, 560 F.3d at 162 (holding testimony contradicting plaintiff's affidavit raises a credibility question for the jury).[28]

We do not make credibility determinations in deciding whether DiFlorio has carried his burden under *McDonnell Douglas* step one.  *See Johnson v. California*, 545 U.S. 162, 171 n.7 (2005) (quoting *St. Mary's Honor Center v. Hicks*, 509 U.S. 502, 509-10, n.3 (1993) for the proposition that "determinations at steps one and two of the *McDonnell Douglas* framework can involve no credibility assessment").  Rather, before any credibility determination is made, we look to DiFlorio's evidence to determine if he has met his burden of production.  *See St. Mary's Honor Center*, 509 U.S. at 509 ("[T]he burden-of-production determination necessarily *precedes* the credibility-assessment stage.");  *Chatterjee v. Mathematics, Civics and Sciences Charter Sch. of Phila.*, No. 01-5626, 2008 WL 2929061, at *10 (E.D. Pa. July 30, 2008) (holding that "defendants' testimony

---

[28] The self-serving nature of DiFlorio's testimony does not preclude us from considering it to determine whether summary judgment is warranted.  *See Velazquez-Garcia v. Horizon Lines of P.R., Inc.*, 473 F.3d 11, 18 (1st Cir. 2007) ("[A] party's own affidavit, containing relevant information of which he has first hand-knowledge, may be self-serving, but it is nonetheless competent to support or defeat summary judgment.") (citations and quotations omitted); *Rodriguez v. Airborne Express*, 265 F.3d 890, 902 (9th Cir. 2001) ("[S]elf-serving affidavits are cognizable to establish a genuine issue of material fact so long as they state facts based on personal knowledge and are not too conclusory.").  Instead, it also raises a credibility question.  *See In re Dana Corp*, 574 F.3d 129, 153 (2d Cir. 2009) ("[T]he self-serving nature of a witness's statements goes to the statements' weight, not to their admissibility.  But the weighing of such statements is a matter for the finder of fact at trial, not the prerogative of the court on a motion for summary judgment.") (internal quotations and citations omitted); *United States v. Shumway*, 199 F.3d 1093, 1104 (9th Cir. 1999) ("That an affidavit is self-serving bears on its credibility, not on its cognizability for purposes of establishing a genuine issue of material fact.").

[contradicting plaintiff] does not undercut plaintiff's prima facie case" and concluding that plaintiff met his burden under *McDonnell Douglas* step one).  Based on DiFlorio's testimony that he attempted to return to work by calling Gibbons on four occasions and speaking with him once, he has met his burden of production to demonstrate that he suffered an adverse employment action.  *See Point-Du-Jour v. Cnty. of Bucks*, No. 99-583, 2000 WL 288247, at *4 (E.D. Pa. Mar. 7, 2000) (denying motion for summary judgment because defendant's claim that plaintiff abandoned her job and plaintiff's claim that she attempted to return to work created a factual dispute).

DiFlorio has also raised an inference of causation.  Less than two months passed between his notifying Aramark that he was filing an EEOC charge for age discrimination and his alleged termination in August or September of 2009.  Such proximity is suggestive of retaliation.  *See Fasold*, 409 F.3d at 189-90.

DiFlorio's absences appear to provide a persuasive, non-retaliatory ground to fire him.  Although Gibbons testified that calling out in advance, as DiFlorio did, is not a violation of company policy,[29] he clarified that "[i]f it's a consistent pattern that you call out, . . . it's noted and appropriate action will need to be taken."[30]  However, DiFlorio was never given a warning or a coaching and counseling session, which Salinger testified was common practice for employees missing multiple events at SBC.[31]  In fact, Gibbons's responses to DiFlorio's emails suggested that there was no problem with him missing the

---

[29] Gibbons Dep. 55.

[30] Gibbons Dep. 55-56.  Salinger testified that "[t]here is no magical number" of times an employee may not call out of work. Salinger Dep. 63.

[31] Salinger Dep. 57-58.

events due to his foot and ankle injuries.  Assuming DiFlorio suffered an adverse employment action, the temporal proximity, coupled with Aramark's failure to consistently apply its policies to him, is circumstantial evidence of a causal link.  Therefore, DiFlorio has met his burden of production under step one of *McDonnell Douglas*.

DiFlorio has presented evidence of pretext.  He claims that Aramark refused to schedule him to work events even after he spoke with Gibbons.  If the jury believes DiFlorio, it can reject Aramark's only proffered reason for why he was no longer employed there.  Consequently, a factfinder could determine that Aramark's explanation is a pretext for retaliation.  *See St. Mary's Honor Ctr.*, 509 U.S. at 511 ("The factfinder's disbelief of the reasons put forward by the defendant (particularly if disbelief is accompanied by a suspicion of mendacity) may, together with the elements of the prima facie case, suffice to show intentional discrimination."); *Point-Du-Jour*, 2000 WL 288247, at *4 (denying summary judgment where plaintiff offered evidence contradicting employer's claim that she abandoned her job).  Therefore, we shall deny Aramark's motion for summary judgment on DiFlorio's retaliation claim.

**Mitigation of Damages**

DiFlorio has not worked since he last worked for Aramark in September of 2009. He admits that he did not start searching for another job until January 2010.  He claims that once he started searching for openings, he reviewed newspapers and websites.  He also stated that he applied to fourteen businesses, ranging from bars and restaurants to a construction company.[32]  However, he acknowledged that because his father was sick, he

---

[32] Pl.'s Ex. 31, at 1-2 (Supp. Resp. to Def.'s First Set of Interrog.).

was not aggressively looking for work from February to April of 2010.  He also stated that during his children's summer vacation from June to August of 2010, his job search "tailed off."  He testified that he was most actively seeking employment from September to November of 2010.  From December 2010 to the present, he "continued to send stuff out here and there" but "didn't feel an immediate rush to run out and get something."[33]  He also acknowledged that even if he was offered a job, he would not necessarily accept it because it may require him to pay for daycare for his children.

Aramark argues that DiFlorio's efforts are insufficient to mitigate his damages.  It claims that based on his testimony, he "really only searched for work in January 2010, May 2010 and September 2010 because he stopped searching to care for his father from February to April 2010 and to care for his children from June to August 2010."[34]

DiFlorio disputes this characterization of his testimony, asserting that he "conducted extensive employment efforts from January 2010 until the beginning of 2011; including newspaper searches, online job searches, and applying to over 14 different employers."[35]  He acknowledges that his efforts were limited at times due to his responsibilities taking care of his father and children.

The plaintiff has a duty to mitigate his damages, but the employer has the burden of proving the plaintiff's failure to mitigate.  *Robinson v. Se. Pa. Transp. Auth.*, 982 F.2d

---

[33] DiFlorio Dep. 159.

[34] Def.'s Mot. Summ. J. 14.

[35] Pl.'s Resp. to Def.'s Mot. Summ. J. 23.

22

892, 897 (3d Cir. 1993).[36]  To meet this burden, the employer must demonstrate that the plaintiff did not exercise reasonable diligence to obtain available employment that is substantially equivalent to his former position.  *Le v. Univ. of Penn.*, 321 F.3d 403, 407 (3d Cir. 2003) (quoting *Booker v. Taylor Milk Co.*, 64 F.3d 860, 864 (3d Cir.1995)).  A plaintiff exercises reasonable diligence by "demonstrating a continuing commitment to be a member of the work force and by remaining ready, willing, and available to accept employment."  *Booker*, 64 F.3d at 865.  Whether or not a claimant has met his duty to mitigate damages is a factual determination.  *Id.* at 864.

Aramark asks us to depart from the reasonable diligence standard and determine that DiFlorio withdrew entirely from the labor market.  Although this requires a greater showing relating to DiFlorio's efforts to find a job, Aramark would not need to demonstrate that substantially equivalent employment is available, which it has not done.

We are unaware of, and Aramark has not cited to, any precedential Third Circuit opinion applying this standard to an ADEA or Title VII claim.  However, the Third Circuit has applied the standard to reverse an award of back pay in the NLRA setting.  *Tubari, Ltd. v. NLRB*, 959 F.2d 451 (3d Cir. 1992).  In so doing, it held that the lack of evidence of other available work was irrelevant where the plaintiffs "made no search for comparable interim employment."  *Id.* at 459 (citations omitted).

In a non-precedential opinion, the Third Circuit, relying on *Tubari*, acknowledged that a defendant may demonstrate a failure to mitigate by showing that the plaintiff

---

[36] Unlike Title VII, the ADEA does not contain an express mitigation-of-damages provision.  However, the Third Circuit has extended Title VII's statutory duty to mitigate to plaintiffs seeking compensatory damages under the ADEA.  *See, e.g., Starceski v. Westinghouse Elec. Corp.*, 54 F.3d 1089, 1101 (3d Cir. 1995) (stating defendant in ADEA case bears the burden of demonstrating the plaintiff failed to mitigate).

"withdrew entirely from the employment market." *Caufield v. Ctr. Area Sch. Dist.*, 133 F. App'x 4, 11 (3d Cir. 2005). District courts sitting in the Third Circuit have relied on *Tubari* and *Caufield* to acknowledge that an employer need not provide evidence that substantially equivalent work is available if its former employee has entirely withdrawn from the job market.[37] Although relieving the defendant of the burden of demonstrating that substantially equivalent work was available is a sensible response to a plaintiff making no effort to find employment, disputed issues of material fact preclude us from determining at this time whether DiFlorio withdrew entirely from the workforce.

DiFlorio may be eligible for back pay from the date of his alleged termination from SBC.[38] He testified that he made no effort to find employment from the time of his alleged termination in August or September 2009 until the beginning of 2010. Whether and when he was terminated are disputed factual questions. If the factfinder identifies a date when DiFlorio was terminated, a reduction in back pay reflecting the fact that he made no attempt to find employment until the beginning of 2010 may be appropriate.

---

[37] *McKenna v. City of Phila.*, Nos. 98-5835, 99-1163, 2010 WL 2891591, at *18 (E.D. Pa. July 20, 2010), *aff'd on other grounds*, 649 F.3d 171 (3d Cir. 2011); *Holocheck v. Luzerne Cty. Head Start*, No. 04-2082, 2007 WL 954308, at *14 (M.D. Pa. March 28, 2007); *Stager v. Beneral Health and Rehab. Servs., Inc.*, No. 2006-101, 2008 WL 3165837, at *19-20 (W.D. Pa. Aug. 6, 2008); *see also Conway v. Hercules, Inc.*, 831 F. Supp. 354, 359 n.13 (D. Del. 1993) (relying on *Tubari* to observe that an ADEA defendant may prove failure to mitigate by demonstrating plaintiff made no effort to secure employment); *Wooley v. Colonial Sch. Dist.*, No. 91-407, 1993 WL 431208, at *3 (D. Del. May 11, 1993) (relying in part on *Tubari* to hold that "[i]n light of plaintiff's decision not to seek other employment, defendants are entitled to a jury instruction on failure to mitigate regardless of the availability of equivalent work"). *But see Tomasso v. The Boeing Co.*, No. 03-4220, 2007 WL 2458557, at *4 (E.D. Pa. Aug. 24, 2007) (rejecting claim that jury instruction should have permitted jury to find a failure to mitigate because plaintiff completely withdrew from labor market because to do so would have "improperly injected defendant's argument into the court's instructions to the jury" and there was sufficient evidence in the record that plaintiff made reasonable efforts to reduce damages); *Sheridan v. E.I. duPont de Nemours*, No. 93-46, 1994 WL 468711 (D. Del. Mar. 28, 1994) (declining to extend *Wooley* and find that plaintiff failed to mitigate damages at summary judgment phase).

[38] Having granted Aramark's motion for summary judgment on DiFlorio's age discrimination claim, he is not entitled to back pay following his termination from the Wachovia Center.

There is a factual dispute whether DiFlorio withdrew from the workforce for some time in 2010.  Aramark argues DiFlorio only searched for work in January, May, and September of 2010.  DiFlorio claims that he conducted extensive employment searches in 2010, but acknowledged that from February to April and June to August, his job search "tailed off."  DiFlorio's testimony is ambiguous.  The parties use this ambiguity to make contradictory arguments, resulting in a factual dispute for the factfinder to resolve.[39]

Similarly, DiFlorio's testimony precludes us from concluding that he removed himself from the labor market entirely beginning in 2011.  DiFlorio testified that he "didn't feel an immediate rush to run out and get something," but that he "continued to send stuff here and there."[40]  These efforts, although ill-defined, contrast with those of the plaintiff in *McKenna*, 2010 WL 2891591, a case upon which Aramark relies.  After being fired, McKenna "submitted no applications for employment to any employer" for five years, leading the court to conclude that he completely withdrew from the workforce.  *Id.* at *17; *see also Holocheck*, 2007 WL 954308, at *15 (holding that plaintiff completely withdrew from the workforce because her testimony indicated that she "made no effort to obtain any substitute employment").

DiFlorio testified that even if he had obtained a job offer, he would not have necessarily accepted it because he would have to weigh his earnings against childcare costs.  There is no evidence that he did not apply for an available position, withdrew his

---

[39] We need not determine whether, as Aramark argues, DiFlorio's efforts in the months he was more actively looking for work "fall short of the necessary reasonable efforts."  In so arguing, Aramark relies on authorities applying the reasonable diligence standard.  Because it has proffered no available substantially equivalent positions, we need not determine whether DiFlorio's search lacked reasonable diligence.

[40] DiFlorio Dep. 159.

application, or declined a job offer based on this concern.  At this time, we cannot conclude that DiFlorio entirely removed himself from the job market from 2011 to present.

### Conclusion

Because DiFlorio has failed to proffer any evidence that Aramark's decision to terminate him was a pretext for age discrimination, we shall grant Aramark's motion for summary judgment on DiFlorio's age discrimination claim.  There is a genuine dispute of material facts surrounding DiFlorio's departure from Aramark after he recovered from his foot and ankle injury.  Therefore, we shall deny the motion on his retaliation claim.